**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-00183 (TSC)** |
| **v.** | : | |
| | : | |
| **MICHEAL POMEROY,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Michael Pomeroy to 30 days of incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

**I.        Introduction**

Defendant Michael Pomeroy, age 52, a retired handyman from Carlisle, Pennsylvania, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

Defendant Pomeroy pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 30 days of incarceration is appropriate in this case because (1) Pomeroy was near the front of a crowd that removed police barriers and assaulted police officers at the East Front of the Capitol; (2) while Pomeroy did not make contact with the police, he observed the violence and then joined the crowd in advancing forward into the restricted area of

1

the Capitol; (3) he took video or photographic images of the riot in and outside the Capitol, which were no longer on his phone when it was seized by law enforcement; and (4) Pomeroy has not expressed remorse for what he did.

The Court must also consider that Pomeroy's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and to disrupt the proceedings.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol in the Statement of Offense at 1-7.

*Defendant Pomeroy's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Pomeroy traveled to Washington, D.C. to participate in the "Stop the Steal" rally. Pomeroy traveled with other members of a Pennsylvania organization called "Free PA." On its public website, https://www.freepa.net/, Free PA lists its mission as, among other things, organizing physical meetings for like-minded patriots to gather, communicate and strategize, and to "secure our elections." Two other associates of Free PA, Brian Korte and Lynwood Nester, with whom Pomeroy traveled to the Capitol, are the co-defendants in this case.[1]

---

[1] On May 25, 2022, Korte, Nestor, and Pomeroy were charged by Information with violating 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds), 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds), 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building or Grounds), and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building). On March 24, 2023, Korte pled guilty to Count 4, charging 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building). Korte's sentencing is scheduled for July 12, 2023. Nestor is awaiting trial, scheduled for October 16, 2023.

At approximately 1:59 p.m., Pomeroy was part of a crowd gathered on the East Plaza of the U.S. Capitol.  Many individuals in the crowd held flags and signs.

Members of the crowd assaulted the police and removed metal security barriers used by the Capitol police to prevent unlawful access into the restricted area of the Capitol grounds. Pomeroy stood in close proximity to the location where rioters were fighting with the police, observing as rioters pulled metal barricades out of the hands of police officers and eventually succeeded in overrunning the police line.



*Figure 1: the mob crowding against the police lines and removing metal barriers used by the police on the East Front Plaza.  Pomeroy is located on the left side of the picture, circled in blue. A bike rack barrier can be seen being removed by members of the crowd as police struggle to hold onto it.*

After barricades had been removed by the crowd, Pomeroy joined the crowd in surging forward into the restricted area on the East Plaza. On the steps, police officers formed a second line, attempting to prevent the mob from advancing further to the doors to the Capitol building. However, this police line was also overrun by the crowd.



*Figure 2: Capitol Police Officers attempt to prevent the mob from advancing up the steps to the Rotunda Door of the Capitol*

Pomeroy, along with other members of Free PA, joined the rioters in advancing up the stairs toward the Rotunda door to the Capitol.



*Figure 3: Pomeroy (circled in blue) on the East Front steps of the Capitol before he entered through the Rotunda Door*

At the top of the steps, Pomeroy posed for a photo with other members of Free PA.



*Figure 4: Pomeroy, second from left (circled in blue), and other charged members of Free PA, including co-defendants Korte (first on left) and Nester (fourth from left), posing on the balcony of the East Front—an area within the restricted area of the Capitol grounds—after having joined the mob that overran police lines on the East Front stairs.*

At approximately 2:45 p.m., Pomeroy entered the U.S. Capitol building through the Rotunda Door. Pomeroy entered as part of a mob of rioters, at a time and place when U.S. Capitol Police officers were attempting to prevent rioters from entering.



*Figure 5: Pomeroy (circled in blue), wearing an American flag bandana over his face, enters the Capitol as police officers can be seen behind him struggling with the crowd*

5

Pomeroy entered on the second floor on the east side of the building and walked to several locations, including the Capitol Rotunda.  Pomeroy can be seen on CCTV video using his phone to take pictures and/or videos inside the Capitol.



*Figure 6: Pomeroy (circled in blue) in the Capitol Rotunda, holding his phone in his right hand.*

Pomeroy remained inside the Capitol building for approximately 20 minutes.  He exited the Capitol building at 3:05 p.m. through the same door that he had entered.



*Figure 7: Pomeroy (circled in blue) about to exit the Capitol through the Rotunda Door*

*The Charges and Plea Agreement*

On May 11, 2022, the United States charged Pomeroy, Korte, and Nestor by criminal complaint with violating 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building or Grounds); and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building).

On May 20, 2022, law enforcement officers arrested Pomeroy in Harrisburg, Pennsylvania. On May 25, 2022, the United States charged Pomeroy, Korte, and Nestor by a four-count Information with violating 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G).

On February 8, 2023, pursuant to a plea agreement, Pomeroy pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Pomeroy agreed to pay $500 in restitution to the Architect of the Capitol.[2]

### III.    Statutory Penalties

Pomeroy now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

---

[2]  As noted above, co-defendant Korte recently pled guilty to violating 40 U.S.C. § 5104(e)(2)(G) and is awaiting sentencing, while co-defendant Nestor is awaiting trial on all four charges.

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 30 days imprisonment.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Pomeroy's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Pomeroy, the absence of violent or destructive acts is not a mitigating factor. Had Pomeroy engaged in such conduct, he or she would have faced additional criminal charges.

One of the most important factors in Pomeroy's case is that he was present, within a few feet of violent members the mob that overran the police lines on the East Front of the Capitol. While the Government is unaware of evidence that Pomeroy himself made physical contact with

police officers, he stood within a few feet of other rioters who wrestled the metal barricades away from the police, creating the gap through which the rest of the mob surged.

Rather than turn away after observing other members of the crowd fighting with the police, Pomeroy joined these individuals in advancing forward though the broken police line. When the police fell back and attempted to make a second line on the stairs, Pomeroy joined the mob that climbed the steps and overwhelmed the police line.

At the doors of the Capitol, Pomeroy again was in close proximity to other individuals who behaved violently toward the police. He was within a few feet of the door that officers of the U.S. Capitol Police fought to keep closed.  When other rioters succeeded in opening this door, Pomeroy advanced with the mob into the U.S. Capitol building.

Thus, while he may not have physically engaged with the police himself, Pomeroy was an essential part of the mob that overwhelmed the police through its sheer numbers. He was close to the front, and without his presence – like the many other rioters who did not turn away from the violence but rather advanced forward toward it – the crowd would not have attained the numbers necessary to overwhelm the police lines.

Pomeroy entered the Capitol building and stayed inside for approximately 20 minutes. The Government is unaware of evidence that Pomeroy participated in the destruction of property or assaulted law enforcement inside the Capitol.  However, Pomeroy can be seen in multiple pictures and videos appearing to take video or still photographs with his phone.  No such videos or images were found on Pomeroy's phone at the time of his arrest, suggesting that he had deleted them.

In sum, the nature and the circumstances of this offense support the Government's recommendation of 30 days' imprisonment.

### B.  The History and Characteristics of Pomeroy

Other than an arrest for Possession of Liquor, Marijuana and Drug Paraphernalia when Pomeroy was 18 years old, which was subsequently dismissed, Pomeroy has no known arrests or convictions.  PSR 36.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

10

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As noted above, Pomeroy has not expressed remorse for his acts on January 6. The government is aware of no such statement of remorse when Pomeroy was interviewed by law enforcement after his arrest or during the time preceding the sentencing hearing. Accordingly, the Court may reasonably conclude that deterrence is warranted to prevent Pomeroy from committing similar acts again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Pomeroy based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Pomeroy has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the

discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the

spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the exact same balance of aggravating and mitigating factors present here, the Court may consider other cases in which defendants pled guilty to violating 40 U.S.C. § 5104(e)(2)(G). In the cases discussed below, the defendants were not alleged to have engaged in violence or destruction of property. Like Pomeroy, they were charged with only misdemeanors and pled guilty to one count of Parading, Demonstrating, or Picketing in a Capitol Building.

For example, in *U.S. v. Jeremy Sorvisto*, 21-CR-320-ABJ, the defendant entered the Capitol building and remained inside for 25 minutes; afterwards, he instructed others to destroy a photo he had taken in the Capitol and generally expressed no remorse. He was sentenced to 30 days of incarceration. In *U.S. v. Oliver Sarko*, 21-CR-591-CKK, the defendant observed other rioters violently enter the Capitol building before entering himself; he made statements, including "we are storming the Capitol" and went to several locations within the Capitol, including the office of a congressperson. He was also sentenced to 30 days. In *U.S. v. John Cameron*, 22-CR-017-TFH, the defendant entered the Capitol building past alarms and broken glass and remained inside for 20 minutes; he filmed a conflict between police and the crowd and posted afterwards that

January 6 was a "fun, exciting" event. Like others who engaged in similar conduct, he received a sentence of 30 days.

While the details in each case differ, the conduct is generally similar to that of Pomeroy. In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[4]

---

[4] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation,"

## V.       Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

                          Respectfully submitted,

                          MATTHEW M. GRAVES
                          United States Attorney
                          D.C. Bar No. 481052

              By:     s/ *Brian Morgan*
                          BRIAN MORGAN
                          NY Bar No. 4276804
                          Trial Attorney
                          601 D Street, N.W.
                          Washington, D.C. 20530
                          Brian.morgan@usdoj.gov
                          (202) 305-3717

---

described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

## **CERTIFICATE OF SERVICE**

On this 1st day of May, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

/s/ *Brian Morgan*
Trial Attorney
601 D Street, N.W.
Washington, D.C. 20530
Brian.morgan@usdoj.gov
(202) 305-3717